UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

ABQ MANUFACTURING, INC.,                          Case no. 14-13366 t11

    Debtor.

## OPINION

    Before the Court is a fee application filed by Albuquerque Business Law, P.C. The application seeks approval of $11,799.70 in fees, costs, and expenses, for time billed between counsel's appointment and November 2015. After considering the application, Debtor's objection, and the evidence presented at a final hearing, the Court will allow $7,905.80 in compensation. The Court will overrule counsel's late request to increase the application from $11,799.70 to $38,293.54.[1]

### I.     FACTS

    Debtor owns and operates a company offering powder coating (a form of "dry" painting), precision masking, and sandblasting services. For many years Debtor leased commercial space in northeast Albuquerque from Jerry and Lynn Mosher. Debtor's principal, Charles Bruce Bell, signed the lease as an additional lessee.

    In the fall of 2014 Debtor stopped pay rent, prompting the Moshers to sue Debtor and Bell in state court for eviction and breach of lease (the "Eviction Action"). The complaint alleged that Debtor owed $92,532.75 under the lease. Debtor and Bell retained James T. Burns of Albuquerque Business Law, P.C. ("Counsel") to defend the Eviction Action.

    Within a few weeks, Counsel and Bell determined that Debtor should file a chapter 11

---

[1] Counsel later reduced this request to $33,044.65.

bankruptcy case. Debtor filed this case, a small business case, on November 14, 2014. A week later, Counsel filed an application pursuant to 11 U.S.C. § 327[2] to be employed as attorney for the Debtor.

On December 14, 2014, the Moshers filed a proof of claim for $283,859.70, an increase of $191,326 over the amount sought in the Eviction Action.

By an order entered January 7, 2015, the Court approved the employment application. The order provided that all compensation is subject to final Court approval.

Debtor also employed Craig Dill, who had worked with Bell for many years, as a financial advisor and turnaround specialist. Dill assisted Bell in preparing all financial documents used in the case.

Bell became unhappy with Counsel shortly after he was retained, for two reasons. First, Counsel filed bankruptcy schedules, purportedly signed by Bell, that Bell had never seen or approved. The schedules were materially inaccurate. For example, they show that Debtor's assets were worth more than its liabilities, because Counsel valued the assets at original cost rather than depreciated book value. Dill had provided Counsel with a balance sheet before the schedules were filed, but Counsel failed to account for depreciation as Dill had directed. Bell received copies of the filed bankruptcy schedules for the first time shortly before the § 341 meeting. In response to questions by the United States Trustee ("UST"), Bell disagreed with much of the information on the schedules, an unusual and awkward situation.

Second, Counsel advised Bell not to appear at a November 20, 2014 hearing in the Eviction Action. The automatic stay had not stayed the Eviction Action as to Bell, so the state court judge issued an order directing Counsel and Bell to show cause why they should not be held in contempt

---

[2] Unless otherwise noted, all statutory reference are to 11 U.S.C.

of court for failing to appear.  Counsel responded that he assumed the Bankruptcy Court and/or the Moshers' counsel would notify the state court of the bankruptcy filing.[3]  The state court judge was not satisfied, and ordered Counsel to attend five hours of professionalism training and pay Moshers' attorney fees incurred attending the missed hearing.  She did not sanction Bell.

After the missed hearing, Counsel filed two adversary proceedings seeking to extend the protections of the automatic stay to Bell individually.  The first adversary complaint, filed December 15, 2014 (adv. no. 14-1137), was denied without prejudice because Counsel did not demonstrate that the Eviction Action against Bell would impede Debtor's ability to reorganize.  *See generally In re Otero Mills, Inc.*, 21 B.R. 777 (Bankr. D.N.M. 1982).  The second complaint, filed April 20, 2015 (adv. no. 15-1032), resulted in a settlement with the Moshers, under which the parties agreed to a 120-day stay of the Eviction Action in exchange for Bell making three monthly installment payments of $1,223.85.

In February 2015, Debtor relocated its business to downtown Albuquerque, and sought to reject the Mosher lease.  On July 8, 2015, the Court approved the rejection.  Thereafter, the Moshers amended their proof of claim, increasing the amount claimed to $345,399.06.  Debtor objected to Moshers' amended claim, focusing on the dramatic, unexplained increase in the claim amount.  Around that time, Counsel also set a claims bar date and obtained entry of a court approval allowing Debtor to sell certain excess equipment.

On August 20, 2015, the UST's office sent Counsel an e-mail reminding him that the 300-day deadline to file a plan and disclosure statement in Debtor's small business case expired on September 10, 2015.[4]  Despite the reminder, Counsel did not file a plan until September 14, 2015, nor did he seek an extension of the filing deadline.  Counsel filed an amended plan and disclosure

---

[3] The Court serves no such function, as Counsel should know.
[4] *See* § 1121(e)(2).

-3-
Case 14-13366-t11    Doc 186    Filed 05/25/17    Entered 05/25/17 15:05:55 Page 3 of 12

statement on September 16, 2015.

Both plans and disclosure statements contained obvious errors. For example, the first disclosure statement had various highlighted brackets where Counsel did not fill in the relevant information, such as: [General unsecured creditors are classified in Class ___, and will receive a distribution of ___% of their allowed claims, to be distributed as follows___.] Both disclosure statements referred to exhibits that were not attached, including a list of assets, a financial statement, an operating report, and a statement of projected cash flow.

The plans also contained generic sections taken from a form plan, such as "Class 2: The claim of $____, to the extent allowed as a secured claim under § 506 of the Code." The generic sections included notes in brackets about when and how to fill in the missing information. These notes appear throughout the documents. Further, the plans provide that Debtor would not receive a discharge, even though they are not liquidating plans and only pay unsecured creditors a 5% dividend.

It is not unusual for attorneys to go through several draft plans before confirmation, and the Court has no wish to harp on every mistake. Here, however, the drafting and analytical errors were so pervasive and egregious that Counsel either did not read documents, or else submitted them as a placeholders just to "get something on file."

Counsel did not seek Bell's approval before filing the plans and disclosure statements. Nevertheless, the documents all have Bell's signature ("/s/ Bruce Bell – *electronically approved*"). Bell was upset when he saw the documents. He sent Counsel an e-mail asking him not to file any more documents without his approval, and demanding that Counsel make all necessary corrections. At the time, Bell did not understand the consequences of missing § 1121(e)(2)'s 300-

-4-
Case 14-13366-t11    Doc 186    Filed 05/25/17    Entered 05/25/17 15:05:55 Page 4 of 12

day deadline.[5]

On October 15, 2015, the Court (Hon. Robert Jacobvitz) held a status conference on Debtor's amended plan and the Mosher claim objection. The Court ordered the Moshers to provide detailed records supporting each component of their claim, and to amend the claim if necessary. The Court also directed Counsel to file a second amended plan and disclosure statement by October 16, 2015, at 3:00 p.m., to enable a prompt confirmation hearing.[6] Counsel missed the deadline by about two hours. By an order entered October 19, 2015, the Court noted the late filing, but determined that a prompt hearing was not necessary because Debtor could not meet the deadlines imposed on small businesses.

On November 5, 2015, the Moshers withdrew their claim. They did not give a reason.[7]

On or about November 17, 2015, Counsel met with an attorney from the UST's office to discuss the case. He then sent Bell an e-mail stating: "Her recommendation [is] to simply dismiss the case and put together an informal reorganization with Anderson. We could also convert the business case or dismiss the business case now with the plan to refile later as a Chapter 7." The e-mail went on to explain why an informal reorganization would be more flexible and cost-effective than remaining in bankruptcy. A supplemental exhibit filed after trial confirms that on November 16, 2015, the UST's office sent Counsel an email raising the possibility of dismissing the case.[8]

On November 20, 2015, the UST objected to Debtor's second amended plan and disclosure

---

[5] Counsel's explanation for the missing the deadline was that he could not propose a plan without resolving the Mosher claim. The Court finds this unpersuasive, given that Counsel filed a plan before the Mosher claim was resolved, and within four days of the deadline.

[6] At the time, the Court had not been alerted to the § 1121(e)(2) problem.

[7] At trial, Dill and Debtor's new counsel speculated that the Moshers withdrew their claim because the large amount could not be defended. This is a plausible explanation.

[8] In the interest of ruling on the merits, and because the allegations against Counsel are serious, the Court considered the supplement even though it was offered after trial. Given the timing of the email, the Court finds that the UST's office most likely mentioned the dismissal alternative because Counsel missed the 300-day deadline.

statement:

> This case was filed as a small business case. Debtor filed its plan and disclosure statement on September 14, 2015 (docket numbers 69 and 70), four days after the expiration of the 300 day deadline.

Counsel had never told Bell about this serious problem.

After reviewing the UST's objection, Bell asked Dill to recommend a new attorney. On November 23, 2015, Debtor retained Don Harris of NM Financial Law, P.C. Counsel's services were terminated.

Harris withdrew Debtor's plan and asked Kristian Anderson – Debtor's major secured creditor and Bell's former business partner - to file a creditor plan. Anderson retained counsel and prepared a plan. By an order entered September 12, 2016, the Court confirmed the creditor plan.

Counsel filed his application for attorney fees on December 17, 2015, stating:

> To date, the Debtor has an outstanding balance with ABL in the amount of $38,293.54. ABL has incurred $11,799.70 in attorney fees at this time. ABL requests that the Debtor be responsible for paying $11,799.70 to ABL for all attorney's fees incurred during the representation of the Debtor's Chapter 11 Bankruptcy case.
> WHEREFORE, Albuquerque Business Law, P.C. respectfully requests this Court grant this Motion for Allowance of Attorney's Fees in the amount of $11,799.70.

Nine months later, Counsel sent out a notice of deadline to object to the fee application to all parties listed on the mailing matrix.

Counsel testified he sought approval of only $11,799.70 as a settlement offer of sorts. He likely hoped no one would object to the substantially discounted fee (31% of the outstanding balance). Debtor did object, however, asserting that none of Counsel's services were necessary, beneficial, or reasonable. Debtor also filed a motion that Counsel be forced to disgorge all fees paid to him.

The Court set the application for trial on January 25, 2017. On the afternoon before trial,

Counsel filed an amended application, with attached billing statements. The prayer for relief again requested approval of only $11,799.70. At the beginning of the trial, however, Counsel for the first time requested allowance of $38,293.54, more than three times the amount sought the day before.

By an order entered April 13, 2017, the Court directed Counsel to fix certain discrepancies between his retainer agreement and his billing statements. The Court also allowed Counsel "to make any other reductions or corrections it deems necessary, provided they result in a downward adjustment." Counsel made the required corrections, but also amended the application to request $33,044.65 in fees.[9]

Counsel received a $5,000 retainer in 2014, but has not been paid since then for work on the bankruptcy case.

## II. DISCUSSION

### A. The Last Minute Request for Approval of $38,293.54.

As an initial matter, Counsel must overrule Counsel's request to increase his fee application from $11,800 to nearly $38,300. Bankruptcy Rules 2002(a)(6) and (c)(2) require fee applicants to provide a notice, specifying the amount requested, to all creditors and parties in interest. NM Local Rule 9004-1 likewise requires the movant to provide an adequate summary of relief requested to creditors. Counsel served notice of the original application but did not mention the amount sought.[10] However, Debtor's new counsel got a copy of the original application by electronic service, in which Counsel sought only an $11,799.70 award. The amended application, filed on the eve of trial, asked for the same amount. It was not until opening argument that

---

[9] The difference between this figure and $38,293.54 is apparently the amount billed for the flawed plans and disclosure statements.

[10] If the Court were persnickety, this alone would be enough to deny the application without prejudice.

Counsel's attorney made the surprising request that more than $38,000 be allowed. Given the procedural defects and unfairness of such a last-second change, the Court will not consider approving any amounts over $11,799.70.

B.     11 U.S.C. § 330(a).

Attorney compensation in Chapter 11 cases is governed by 11 U.S.C. § 330(a). To be compensable, the fees must be for services that were "actual" and "necessary." § 330(a)(1)(A). If the applicant clears these hurdles, then the fees must be "reasonable." *Id. See also In re Lederman Enterprises, Inc.*, 997 F.2d 1321, 1323 (10th Cir. 1993); *In re Commercial Financial Services, Inc.*, 427 F.3d 804, 811 (10th Cir. 2005) (the applicant has the burden of proving its services were actual and necessary, and its fees reasonable in amount).

Whether services were necessary means "whether they were necessary to the administration of, or beneficial toward the completion of, a case under [title 11]." *In re Schupback Investments, LLC,* 2014 WL 6680122, at *8 (10th Cir. BAP 2014). *See also Lederman*, 997 F.2d at 1323 (necessary services are those that benefitted the estate). The potential benefit must be measured when the services are provided, not when the fee application is heard. *Schupback Investments,* 2014 WL 6680122, at *8; *In re Kitts Development*, 474 B.R. 712, 720 (Bankr. D.N.M. 2012); *In re Macco Properties, Inc.,* 540 B.R. 793, 868 (Bankr. W.D. Okla. 2015). Thus, work that had a reasonable chance of succeeding when it was performed can be necessary and beneficial even if it is not ultimately successful. *Schupback Investments*, 2014 WL 6680122, at *8; *Kitts Development*, 474 B.R. at 721.

In evaluating the reasonableness of a proposed fee, "the adjusted lodestar approach is used, "taking into account each of the factors specifically mentioned in § 330(a)(3) plus additional … factors" articulated in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714 (5th Cir. 1974). *In*

*re Market Center East Retail Property, Inc.,* 730 F.3d 1239, 1249 (10th Cir. 2013). Section 330(a)(3) requires courts to consider the nature, extent, and value of the services, taking into account all relevant factors, including:

> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). The *Johnson* factors, which are somewhat duplicative of § 330(a)(3), require the Court to consider:

> (1) The time and labor required;
> (2) The novelty and difficulty of the questions;
> (3) The skill requisite to perform the legal service properly;
> (4) The preclusion of other employment by the attorney due to acceptance of the case;
> (5) The customary fee;
> (6) Whether the fee is fixed or contingent;
> (7) Time limitations imposed by the client or the circumstances;
> (8) The amount involved and the results obtained;
> (9) The experience, reputation, and ability of the attorneys;
> (10) The "undesirability" of the case;
> (11) The nature and length of the professional relationship with the client; and
> (12) Awards in similar cases.

*Market Center East,* 730 F.3d at 1247 (citing *Johnson*, 488 F.2d at 717-719).

  C. <u>Applying the Factors to Counsel's Fees</u>.

    1. <u>Difference between billed amount and amount sought</u>. In the typical case, the Court examines different categories of services (such as plan drafting, claim objections,

adversary proceedings, etc.) to determine whether they were necessary and beneficial, and whether the fees charged were reasonable. The Court cannot do that analysis here, however, because of the discrepancy between the requested amount ($11,799.70) and the amount in the supporting billing statements ($38,293.54). The Court will therefore consider Counsel's services and performance as a whole to determine whether they justify an award of $11,799.70. *See, e.g., In re Commercial Financial Services, Inc.,* 427 F.3d 804 (10th Cir. 2005) (the court may determine an entire fee is unreasonable and reduce the amount, provided it considers relevant factors and case law). *See also In re Miniscribe Corp.,* 309 F.3d 1234, 1244 (10th Cir. 2002) (where a trustee performs work that differs in complexity, such that it is difficult to fix one hourly rate, "a solution is to adjust his fee as a whole….").

        2.        <u>Whether Services Were Actual and Necessary</u>. Counsel provided some beneficial services in this case, including obtaining cash collateral authority; filing operating reports; moving Debtor out of the Mosher premises; rejecting the Mosher lease; obtaining Court authority to sell excess equipment, and objecting to the Moshers' seemingly inflated claim.

On the other hand, the Court cannot overlook Counsel's mismanagement in certain areas. *See Rodriguez v. Disner*, 688 F.3d 645, 654 (9th Cir.2012) (a court may consider a lawyer's misconduct in setting fees, recognizing that misconduct might reduce a fee to "zero …when the violation is one that pervades the whole relationship"); *In re Sevitski,* 161 B.R. 847, 856 (Bankr. N.D. Ok. 1993) (reducing fee award based on multiple serious errors). Case mismanagement undercuts the benefit provided by the attorney, and implicates several §330(a)(3) and *Johnson* factors, relating to the attorney's skill, performance, timeliness, relationship with the client, and case outcome.

To recap, Counsel repeatedly reflected Bell's approval on filed documents Bell had not

-10-
Case 14-13366-t11    Doc 186    Filed 05/25/17    Entered 05/25/17 15:05:55 Page 10 of 12

seen; missed deadlines set by the Court; submitted documents that were riddled with blanks, brackets, and other major errors; and missed the § 1121(e)(2) deadline. Further, Counsel told Bell that the UST advised dismissing the case, without explaining that the advice was offered in large part because Counsel had missed the § 1121(e)(2) deadline. Eventually, Debtor was forced to retain new counsel, who worked hard to salvage the case. The Court must reduce the fee award in light of these problems, and after weighing the factors discussed below.

   3. <u>Weighing the factors</u>. The Court weighs the § 330(a) and the *Johnson* factors as follows:

| Factor | Discussion |
| --- | --- |
| The time spent on the services. | Supports an $11,800 fee award. |
| The rates charged for the services. | Supports an $11,800 fee award. |
| Whether the services were or beneficial at the time rendered. | As discussed above, the benefit was undercut by mismanagement. |
| Whether the services were performed timely, given the complexity, importance, and nature of the task. | Does not support an $11,800 fee award. |
| Whether the professional person is board certified or otherwise skilled and experienced in bankruptcy. | Neutral, based on limited evidence. |
| Whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title. | No evidence on this factor. |
| The time and labor required. | Supports an $11,800 fee award. |
| The novelty and difficulty of the questions. | Supports an $11,800 fee award. |
| The skill requisite to perform the legal service properly. | Does not support an $11,800 fee award in this case. |
| The preclusion of other employment. | No evidence on this factor. |
| The customary fee. | Supports an $11,800 fee award. |
| Whether the fee is fixed or contingent. | Not applicable. |
| Any time limitations. | No evidence on this factor. |
| The amount involved and the results obtained. | Does not support an $11,800 fee award. |
| The experience, reputation, and ability of the attorneys. | Does not support an $11,800 fee award in this case. |
| The "undesirability" of the case. | No evidence on this factor. |
| The nature and length of the relationship with the client. | Does not support an $11,800 fee award. |
| Awards in similar cases. | No evidence on this factor. |

Having considered the beneficial nature of Counsel's services at the time they were

rendered, Counsel's missteps, and all of the § 330(a)(3)/*Johnson* factors, the Court concludes it should reduce the requested fee amount by 33%, or $3,893.90. Of the $11,799.70 requested, Counsel therefore will be awarded $7,905.80.

### III. CONCLUSION

The Court is sensitive to the demands of private practice, and to the difficulties of client relations. Taking these concerns into account, Counsel's work nevertheless fell short in this case. The Court will limit Counsel to the $11,799.70 fee request, and will reduce that amount by 33%. A separate order will be entered awarding $7,905.80 in compensation to Counsel.

_____

Hon. David T. Thuma
United States Bankruptcy Judge

Entered: May 25, 2017

Copies to:

Frank T. Apodaca
P.O. Box 30046
Albuquerque, NM 87190

James T. Burns
1801-B Rio Grande Blvd NW
Albuquerque, NM 87104

Don F Harris
320 Gold Avenue SW, Suite 610
Albuquerque, NM 87102